******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DARREN MATTHEW CROSBY
## (AC 37523)

DiPentima, C. J., and Elgo and Bear, Js.

*Syllabus*

Convicted of the crimes of robbery in the first degree and larceny in the third degree in connection with a 2008 bank robbery, the defendant appealed to this court. The defendant claimed, inter alia, that his rights under the Interstate Agreement on Detainers (§ 54-186 et seq.) were violated as a result of the state's delay of more than four years after a warrant for his arrest had been issued before extraditing him to Connecticut from Massachusetts. The police in 2010 had faxed a copy of the arrest warrant to the Massachusetts correctional facility, where the defendant was then incarcerated, at the request of the correctional facility. The correctional facility did not provide the defendant with the appropriate detainer forms and later advised him to submit a request to Connecticut authorities to lodge a detainer for his extradition. Connecticut authorities thereafter lodged a detainer in 2013, after which the defendant was extradited to Connecticut. *Held*:

1. The defendant could not prevail on his claim that the trial court improperly denied his motions to dismiss the robbery and larceny charges, which was based on his assertion that the state's delay in executing the arrest warrant and extraditing him violated his due process rights and his rights under § 54-186:

   a. The trial court did not err in determining that the stated lodged the detainer in 2013, and not in 2010, as the defendant alleged; the copy of the arrest warrant that was faxed to Massachusetts in 2010 did not establish the intent to lodge a detainer, as the fax did not include language that the warrant was sent for the purpose of lodging a detainer, Massachusetts did not consider the faxed warrant to be a detainer, and the defendant was informed multiple times prior to 2013 that a detainer had not been lodged, and the defendant's claim that his rights under § 54-186 were violated was unavailing, as the defendant did not analyze his claim that the alleged failure to comply with the requirements of § 54-186 resulted in a presumption that he was prejudiced, custodial state delays do not automatically require the dismissal of criminal charges in the demanding state, and the defendant failed to demonstrate that any delay was unjustifiable or that he was prejudiced thereby.

   b. The defendant could not prevail on his claim that his rights to due process were violated as a result of the state's delay in lodging the detainer, which he claimed had an impact on the memory of eyewitnesses at trial, thereby resulting in substantial prejudice to him, he having failed to demonstrate that the state's alleged delay in executing the warrant against him resulted in actual, substantial prejudice to him; a general claim of weakened witness memory was insufficient to establish prejudice, any defect in the memory of the state's primary witness prejudiced the state and worked to the defendant's advantage, as his cross-examination of her was effective at exposing her memory gaps and she testified on direct examination by the state that she could not recall the events in question, and the prejudice that the defendant alleged pertained to concerns that are generally protected by the applicable statute of limitations.

2. The defendant's claim that the trial court improperly denied his motion to suppress two eyewitness identifications of him that were made from a police photographic array was unavailing: the identification procedure that the police used was not unnecessarily suggestive, as the photographs in the array were not too dissimilar from the photograph of the defendant, the defendant was not pictured in apparent prison garb, the absence of the use of a sequential, double-blind photographic array, which was not required in 2009, did not render the identification procedure unnecessarily suggestive, the witnesses were not told that a known suspect was in the array, and neither eyewitness was presented with multiple arrays repeating the suspect's photograph; moreover, even if

the photographic array was unduly suggestive, the identifications were reliable under the totality of the circumstances, as they were made close in time to the robbery by witnesses who saw the robber up close in a well lit room and were 100 percent certain that he was the perpetrator when they identified him in the array, and the state's primary witness accurately described the defendant in a sworn statement that she had given to the police.

3. The defendant could not prevail on his claim that he was denied a fair trial because the trial court's jury instruction on identification failed to explain certain factors that negatively impact identifications made by witnesses, and excluded instructions necessary to assist the jury in assessing the accuracy of eyewitness perception and credibility: there were minimal differences between the defendant's request to charge and the instruction given by the court, which included, in substance, the defendant's requested instructions regarding the use of a double-blind identification procedure and the impact of the passage of time on memory, the court did not err in omitting the defendant's request for an instruction on unconscious transference, as there was no evidence to establish that unconscious transference could be an issue for the jury to consider and the defendant provided no authority that such an instruction was required, nor did he offer an expert witness to testify at trial about unconscious transference, and the court's instructions were neither overbroad nor overgeneralized, but were correct in law, adapted to the issue of eyewitness identification and sufficient to guide the jury, as the court, in its discretion, did not need to tailor its charge to the precise letter of the defendant's request.

Argued November 27, 2017—officially released June 5, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of robbery in the first degree and larceny in the third degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Mullarkey, J.*; thereafter, the court denied the defendant's motion to suppress certain evidence; verdict of guilty; subsequently, the court denied the defendant's motions to dismiss; judgment of guilty, from which the defendant appealed to this court; thereafter, the court, *Hon. Edward J. Mullarkey*, judge trial referee, issued an articulation of its decision. *Affirmed.*

*Alec Gulash*, certified legal intern, with whom was *James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *Elizabeth S. Tanaka*, assistant state's attorney, and, on the brief, *Gail P. Hardy*, state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Darren Matthew Crosby, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4)[1] and larceny in the third degree in violation of General Statutes (Rev. to 2007) § 53a-124 (a) (2).[2] On appeal, the defendant claims that the trial court erred in denying his motions to dismiss and his motion to suppress, and improperly concluded that (1) the state and the Massachusetts Department of Correction did not violate his rights under article IV, § 2, clause 2, of the United States constitution and the Interstate Agreement on Detainers (IAD), General Statutes § 54-186 et seq.; (2) the state's delay in executing an arrest warrant against him did not violate his due process rights; (3) the witnesses' identification of him from a photographic array was not the product of an unreliable identifiable procedure; and (4) the jury charge on eyewitness identification was sufficient. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On December 18, 2008, at approximately 1:44 p.m., a robbery took place at the Webster Bank in Enfield. The perpetrator of the robbery was described as a tall black male, clean cut, with an athletic build, and wearing a black hooded type jacket, eyeglasses, a white Red Sox ball cap with a black brim, and black gloves with a Cincinnati style "C" on the backs. Suzanne McVey, a bank teller, acknowledged the man's presence while she assisted another customer and told him that she would be with him shortly. When called forward to the teller window, the man approached McVey, mumbled something inaudible, and handed her a note, which stated, "this [is] a robbery, give [me] all [the] fifties and hundreds, and . . . [I have] a gun." McVey complied with the demand and gave the man cash from her drawer, which later was determined to total $1730. After the man left the bank, McVey informed the bank manager, Kathleen Lee, that she had just been robbed. Lee had been standing behind the teller line, about a foot and one-half from McVey, during the robbery. In accordance with bank procedure, the doors of the bank were locked to prevent the perpetrator from returning, and Lee called 911.

Detective Michael Bailey of the Enfield Police Department arrived at the bank at about 2 p.m., approximately fifteen minutes after the robbery. Lee assisted Bailey in reviewing the bank's surveillance footage. Multiple images of the perpetrator were captured by the bank's security camera. Detective David Thomas of the Enfield Police Department also assisted with the investigation of the robbery. After arriving at the bank, Thomas took a sworn statement from McVey, in which she described the perpetrator as a "[b]lack male, six feet to six feet,

five inches, about thirty years old, thin to a medium build, well groomed, no facial hair . . . . Wearing a white baseball type cap possibly with a Nike logo . . . dark-rimmed regular eyeglasses, black fleece pullover and black pants." No written statement was taken from any other witness.

Detective William Cooper of the Enfield Police Department, who also responded to the bank on the day of the robbery, was assigned as the case officer for the investigation. On February 3, 2009, Cooper went to the bank to present a photographic array to the witnesses to the robbery. McVey and Lee viewed the photographic array separately, and each identified the defendant as the perpetrator of the robbery. An arrest warrant for the defendant, charging him with larceny in the third degree in violation of § 53a-124 (a) (2), and robbery in the first degree in violation of § 53a-134 (a) (4), was issued on February 18, 2009. The defendant was taken into custody by the Enfield police on November 6, 2013.

On April 21, 2014, the defendant filed a motion to dismiss and an accompanying memorandum of law, asserting, inter alia, that the state's unreasonable and unjustifiable delay in executing the arrest warrant violated his rights under the sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the Connecticut constitution.[3] Also on April 21, 2014, the defendant filed a motion to suppress the witnesses' identifications of him. Evidentiary hearings on the motion to dismiss and motion to suppress took place on April 24 and 25, 2014. On April 28, 2014, the court denied the defendant's motion to suppress the witnesses' identifications. The court did not render a decision on the defendant's motion to dismiss prior to trial.

Following a jury trial, on May 5, 2014, the defendant was found guilty of robbery in the first degree in violation of § 53a-134 (a) (4) and larceny in the third degree in violation of § 53a-124 (a) (2). On June 18, 2014, another hearing was held on the defendant's motion to dismiss. On July 1, 2014, the defendant filed a supplemental memorandum of law in support of his motion to dismiss, and he also filed a second motion to dismiss and supporting memorandum of law asserting a violation of his rights under the IAD. On July 9, 2014, the state filed an opposition to the defendant's second motion to dismiss. On August 13, 2014, the court denied the defendant's motions to dismiss. On August 15, 2014, the court sentenced the defendant to a total effective term of five years imprisonment, with five years of special parole, to run consecutively with sentences pursuant to which he was incarcerated in Massachusetts. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court erred in denying his motions to dismiss and improperly concluded that (1) the state and the Massachusetts Department of Correction did not violate his rights under article IV, § 2, clause 2, of the United States constitution and the IAD, § 54-186; and (2) the state's delay in executing an arrest warrant against him did not violate his due process rights. We are not persuaded.

The following additional facts, as set forth in the court's memorandum of decision and otherwise contained in the record, and procedural history are relevant to these claims. On February 18, 2009, a warrant was issued for the defendant's arrest in connection with the December 18, 2008 robbery. At that time, the defendant remained incarcerated in Massachusetts for multiple bank robberies committed in that state.[4] On July 9, 2010, Enfield Police Detective Willie Pedemonti and James Howard, an inspector with the Hartford state's attorney's office, discussed, through facsimile transmissions, authorization to extradite the defendant from Massachusetts to Connecticut, and such extradition was authorized. Extradition, however, was not pursued at that time.

On September 1, 2010, the Enfield Police Department received a telephone request from "Rafael" of the MCI-Cedar Junction correctional facility at South Walpole in Massachusetts, for the defendant's warrant. The telephone call was followed by a facsimile transmission from the MCI-Cedar Junction records department, requesting a copy of the warrant for the defendant's arrest "[i]n order to be able to initiate the IAD process." In response to the request, Stephanie "Dee" Beninato, the records clerk for the Enfield Police Department, faxed a copy of the warrant that same day. It is undisputed that Massachusetts did not treat the faxed warrant as a detainer, and therefore, it did not provide the defendant with IAD forms at that time.

On or about October 13, 2011, in response to an inquiry by the defendant, the Massachusetts Department of Correction advised the defendant that an IAD detainer had not been lodged, and that he should submit a written request to the state to lodge a detainer. On or about December 19, 2011, the defendant sent a "Notice of Whereabouts & Demand for Speedy Trial" to the geographical area number thirteen court in Enfield. Maria Reed-Cook, deputy clerk for that court, advised the defendant in a letter dated December 19, 2011, instead to contact the state's attorney's office in Hartford. On or about April 30, 2012, the defendant sent a "Notice of Whereabouts and Demand for a Speedy Trial" and accompanying letter to Howard at the Hartford state's attorney's office, advising him of his location of incarceration and his efforts to have the arrest warrant served, and asserting his right to a speedy trial.[5] On May 2, 2012, Howard responded to the defendant

and notified him that, as an incarcerated prisoner in another state, his speedy trial request did not apply because he was incarcerated in another state, but that he should contact his prison counselor to assist him in making the necessary arrangements to be brought to Connecticut under the provisions of the IAD.

On or about January 28, 2013, the Massachusetts Department of Correction Souza-Baranowski Correctional Center records manager, Jamie Lewis, notified the defendant in a written letter that "[o]ur records . . . indicate that you have been previously advised that in order to begin the IAD process a detainer must be lodged by the requesting state. A detainer has not been lodged. You have previously been advised that you must write to [Connecticut] and request that a detainer be lodged. Once a detainer is received the IAD process may be initiated." On February 1, 2013, in response to another inquiry from the defendant, Lewis wrote to the defendant to explain that "speedy trial requests are for same state open legal issues. For out of state open detainers IADs are filed. As previously indicated to you, there is no detainer filed therefore IADs do not currently apply . . . ." The defendant then made a written inquiry, dated February 3, 2013, to the geographical area number thirteen court in Enfield. On February 6, 2013, Reed-Cook responded to the defendant, informing him again that "[i]f the warrant to which you refer has not been served on you by an arresting agency, the clerk's office is not the appropriate office to contact. [The clerk's office] only handles matters after an arrest has been made. You must contact the [Hartford state's attorney office], which handles the lodging of detainers."

On May 22, 2013, Pedemonti sent a letter to Kathy Guenther at the Souza-Baranowski Correctional Center, which stated: "The Enfield Police Department currently holds an active arrest warrant for [the defendant] . . . for Robbery 1st and Larceny 3rd. Both are felonies in the [s]tate of Connecticut. Extradition has been authorized by our State's Attorney's Office and the Enfield Police Department will extradite." After receiving the letter, Massachusetts asked the Enfield Police Department to clarify whether Connecticut was lodging a detainer for IAD purposes. On July 23, 2013, the defendant was notified that a detainer had been lodged against him, and he was provided with the necessary IAD forms, which he signed. On August 6, 2013, the Hartford state's attorney's office received the IAD forms. On November 6, 2013, Enfield police arrested the defendant, and he was transported from Massachusetts to Connecticut.

On April 21, 2014, the defendant filed a motion to dismiss the pending Connecticut charges. During the April 25, 2014 hearing on the motion to dismiss, Carl J. Sferrazza, the police chief for the Enfield Police

Department, testified about the general procedure for executing a detainer—that when a warrant is secured for the arrest of a person located out of state, the process is "normally [to] send a copy of that warrant to the home state or the jail where he's being held so they know that he's wanted by us; that would be our normal procedure." Sferrazza testified that he did not believe there was any written procedure, but that "our practice has been, we e-mail or we fax the holding facility our warrant so they're on record that the person is wanted by us." Defense counsel then asked whether Sferrazza was aware that "the process can be accelerated either through extradition or what's called the interstate agreement on [detainers] act," to which Sferrazza explained that "we work hand in hand with the state's attorney's office to get these things done. I, personally, in my career have never been involved in that portion of it, but we work through the state's attorney's office to get these things done."

At the April 25, 2014 hearing, Beninato, the records clerk for the Enfield Police Department, testified that when she faxed the arrest warrant to the Massachusetts correctional facility, she was merely responding to the request from Rafael, that she was not responsible for lodging detainers, and that lodging a detainer is not something she would be asked to do as part of her duties as records clerk. She was asked whether she attached anything to the warrant to show that the state was "making a demand for the defendant's return to . . . Connecticut," to which she responded, "no."

"We initially address the standard of review for a trial court's denial of a motion to dismiss. Because a motion to dismiss effectively challenges the jurisdiction of the court, asserting that the state, as a matter of law and fact, cannot state a proper cause of action against the defendant, our review of the court's legal conclusions and resulting denial of the defendant's motion to dismiss is de novo. . . . Factual findings underlying the court's decision, however, will not be disturbed unless they are clearly erroneous. . . . The applicable legal standard of review for the denial of a motion to dismiss, therefore, generally turns on whether the appellant seeks to challenge the legal conclusions of the trial court or its factual determinations." (Citation omitted; internal quotation marks omitted.) *State* v. *Samuel M.*, 323 Conn. 785, 794–95, 151 A.3d 815 (2016).

A

We first address the defendant's claim that, because the state allegedly lodged a detainer against him on September 1, 2010, but he was not extradited from Massachusetts until 2013, he was entitled to dismissal of the charges against him. Specifically, the defendant contends that his rights were violated when the Massachusetts Department of Correction failed to provide him with the necessary IAD forms after Connecticut

lodged a detainer and misinformed him of his rights, and that Connecticut is vicariously liable for Massachusetts' actions. We are not persuaded.

We begin our analysis by setting forth our standard of review and the relevant legal principles governing the defendant's claim. "The IAD is a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law. . . . Our standard of review of the [defendant's] claim is plenary. We must decide whether the court's conclusion is legally and logically correct and find[s] support in the facts that appear in the record." (Citations omitted; internal quotation marks omitted.) *State* v. *Taylor*, 63 Conn. App. 386, 411–12, 776 A.2d 1154, cert. denied, 257 Conn. 907, 777 A.2d 687, cert. denied, 534 U.S. 978, 122 S. Ct. 406, 151 L. Ed. 2d 308 (2001).

"The purpose of the IAD is to establish a cooperative procedure for disposition of charges against a prisoner in one state who is wanted to respond to untried criminal charges in another state. . . . The IAD is activated when the state seeking the prisoner (the receiving state) files written notice that he is wanted to answer charges in that state. . . . This notice, referred to as a detainer, is simply a notification filed with the institution in which the prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." (Citations omitted; internal quotation marks omitted.) Id., 412.

"After lodging the detainer an appropriate officer of the demanding state may make a written request for temporary custody of the prisoner for the purpose of trying these indictments, informations, or complaints that form the basis of the detainer. . . . Unless the governor of the asylum state disapproves the request for temporary custody within thirty days of its filing, the demanding state shall be entitled to have a prisoner against whom [it] has lodged a detainer. . . . Once a detainer has been filed against a prisoner, custodial officials must promptly notify the prisoner of the source and contents of the detainer and of the prisoner's right to request a final disposition of the foreign charge; General Statutes § 54-186, art. III (c); the prisoner, upon notifying prosecuting officials in the demanding state of his or her request for a final disposition of the charge, must be brought to trial within 180 days of the request; General Statutes § 54-186, art. III (a)." (Citations omitted; internal quotation marks omitted.) *Remick* v. *Lopes*, 203 Conn. 494, 502–503, 525 A.2d 502 (1987).

"The provisions of the [IAD] are activated only when the receiving or charging state lodges with the sending or asylum state a detainer based on a pending indictment, information or complaint." (Internal quotation marks omitted.) Id., 501. Accordingly, the state was not required to comply with the provisions of the IAD until it lodged a detainer against the defendant. See *United*

*States* v. *Mauro*, 436 U.S. 340, 361, 98 S. Ct. 1834, 56 L. Ed. 2d 329 (1978) ("[b]ecause . . . the [g]overnment never filed a detainer against [the defendants], the [IAD] never became applicable and the United States was never bound by its provisions"). Therefore, we first must determine when the state lodged a detainer against the defendant before we address his claim that his rights under the IAD were violated.

The defendant argues that the court erred in determining that a detainer was lodged against him in May, 2013. He contends that a detainer instead was lodged against him when the Enfield Police Department faxed a copy of his arrest warrant to Massachusetts on September 1, 2010. We disagree.

A detainer is "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." (Internal quotation marks omitted.) *State* v. *Milton*, 26 Conn. App. 698, 708, 603 A.2d 750, appeal dismissed, 224 Conn. 163, 617 A.2d 460 (1992). "A detainer . . . need not take any particular form; its purpose is to provide written notice to prison authorities . . . that charges are pending against the prisoner. . . . Thus, a letter from a police department to prison officials . . . a letter from the clerk of court to prison officials . . . and a letter from a prosecuting attorney to prison officials . . . have all been held to fall within the IAD definition of a detainer." (Citations omitted; internal quotation marks omitted.) Id., 708–709.

In the present case, the court found that the state did not lodge a detainer on September 1, 2010, because "it cannot be ascertained whether [state] officials requested that Massachusetts hold the defendant or notify [the state] when the defendant's release was imminent" through the mere sending of the faxed warrant. Importantly, a detainer is initiated by the receiving state (Connecticut), not by the sending state (Massachusetts). See *State* v. *Taylor*, supra, 63 Conn. App. 412. Thus, the fact that the Enfield records clerk faxed a copy of the arrest warrant *in response to a request* for the warrant from Massachusetts does not establish the state's intent to lodge a detainer. As the defendant concedes in his principal brief, "the fax sent by the Enfield Police Department did not include language expressly stating that the warrant was being sent for the purpose of lodging a detainer . . . ." In contrast, the May 22, 2013 letter, signed by Pedemonti of the Enfield Police Department, did indicate the state's intent to lodge a detainer. It provided, in relevant part: "The Enfield Police Department currently holds an active arrest warrant for [the defendant] . . . for Robbery 1st and Larceny 3rd. Both are felonies in the [s]tate of Connecticut. *Extradition has been authorized by our State's Attorney's Office and the Enfield Police Department will extradite.*" (Emphasis added.)

The trial court also found it relevant that, although the warrant was faxed in response to a request from Massachusetts to do so, Massachusetts did not consider the faxed warrant to be a detainer. The parties stipulated to the trial court that "the Massachusetts [Department of Correction] will consider a written document as a detainer triggering the IAD process if the document references a pending criminal charge and requests either (a) that the criminal justice agency be notified when the inmate's sentence is completed or (b) that the Massachusetts [Department of Correction] hold the subject after his sentence is completed so that he can be taken into custody by the receiving state." Although the May, 2013 letter satisfied these criteria, the September, 2010 fax did not.

Furthermore, the defendant was informed multiple times prior to May, 2013, by Massachusetts correctional employees that a detainer had not been lodged against him. It was not until July 23, 2013, that he was notified that a detainer had been lodged against him by the state. On the basis of the foregoing, we conclude that the court did not err in determining that the detainer was lodged against the defendant in May, 2013.

We next consider whether the defendant's rights under the IAD were violated. The defendant claims that "Massachusetts, in [its] capacity as [agent] for [the state], violated the IAD through inaction [and that the state], as principal, is liable for this violation." The defendant contends that Massachusetts' failure to recognize the state's detainer halted the filing procedure, and delayed the triggering of the defendant's rights and duties under the IAD. We are not persuaded. As set forth previously in this opinion, the state lodged a detainer against the defendant in May, 2013. Thus, only two months elapsed between the detainer being lodged and the defendant being informed in July, 2013, that the state had lodged a detainer against him. Even if a detainer effectively had been lodged in September, 2010, however, the defendant's claim still would fail because he has failed to demonstrate that any delay was unjustifiable or that he was prejudiced by any delay.

"Article III of the IAD governs inmate requests for a prompt disposition of outstanding detainers. The centerpiece of Article III is subsection (a), which states that a prisoner shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint . . . . Failure to comply with Article III (a) mandates dismissal with prejudice of the underlying charges." (Citation omitted; internal quotation marks omitted.) *State* v. *Herring*, 210 Conn. 78, 85–86, 554 A.2d 686, cert. denied, 492 U.S. 912, 109

S. Ct. 3230, 106 L. Ed. 2d 579 (1989). "The remaining provisions of Article III address the custodial state's duty 'promptly' to inform a prisoner of outstanding detainers; General Statutes § 54-186, Article III (c); and 'promptly' to forward a request for prompt disposition to the demanding state. General Statutes § 54-186, Article III (b) and (d)." (Footnote omitted.) *State* v. *Herring*, supra, 86.

"Although custodial state delays do not automatically require the dismissal of criminal charges in the demanding state, we would be remiss in our obligation to effectuate the IAD's purposes and principles if we were simply to ignore such a violation. Indeed . . . under the IAD, officials of the custodial state act as the agents of the demanding state. . . . When, in somewhat similar circumstances, we sought to enforce a criminal defendant's right to have his appeal defended by the state with due diligence . . . we found a useful analogy in the rules that have been developed to protect a defendant's constitutional right to a speedy trial. So too [a] defendant's right to prompt IAD notification can appropriately be protected by invoking the balancing principles of *Barker* v. *Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), which determine when a deprivation of speedy trial rights requires dismissal of criminal charges against a defendant. . . . The four factors that form the matrix of a *Barker* v. *Wingo* [supra, 530] analysis are: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (Citations omitted.) *State* v. *Herring*, supra, 210 Conn. 89–90. "We recognize that these factors have no talismanic qualities but rather must be considered together with such other circumstances as may be relevant. . . . The triggering mechanism for our consideration of the *Barker* factors is the length of the delay that the defendant has experienced. . . . As the tolerable length of delay may vary greatly between cases, our inquiry into the length of the delay is necessarily dependent upon the peculiar circumstances of the case." (Citations omitted; internal quotation marks omitted.) *State* v. *Roman*, 320 Conn. 400, 418–19, 133 A.3d 441 (2016).

On appeal, the defendant fails to analyze his claim pursuant to the *Barker* factors, and instead argues that "prejudice is presumed for failure to comply with IAD regulations." As the state asserts, however, the defendant's argument conflicts with established case law, which explicitly states that "custodial state delays do not automatically require the dismissal of criminal charges in the demanding state . . . ." *State* v. *Herring*, supra, 210 Conn. 89. We agree with the state and, thus, reject the defendant's argument that prejudice is presumed by "a delay of this magnitude." Rather, a claim of prejudice resulting from the delay is properly analyzed pursuant to the four *Barker* factors.

Utilizing the *Barker* factors, the trial court in the present case determined that, as to the first factor, the length of the delay between the defendant's sentencing in Massachusetts on July 23, 2010, and his receipt of the IAD forms on August, 26, 2013, was "sufficient to trigger an application of the remaining three factors."[6] As to the second factor, the court concluded that "much of the delay seems to be attributable to a misunderstanding, or miscommunication, on the part of officials in both states concerning whether an IAD detainer had been lodged and the proper way in which to initiate the lodging of a detainer" but that "this factor cuts slightly in favor of the defendant." As to the third factor, the court noted that the defendant made at least one attempt to assert his right to a speedy trial by sending a letter to Howard, but there were also periods of inactivity in asserting that right. Finally, as to the fourth factor, the court concluded that the defendant failed to establish prejudice.[7] The defendant has failed to demonstrate on appeal that any delay was unjustifiable or that he was prejudiced by any delay. Accordingly, we conclude that the court properly denied the defendant's motion to dismiss.

B

We next address the defendant's claim that the court erroneously denied his motion to dismiss because his due process rights were violated by the state's "unreasonable and unjustifiable delay" in executing the arrest warrant against him, extraditing him four years after the warrant was issued. The defendant contends that the unjustifiable delay had an impact on the memory of the eyewitnesses, which resulted in actual, substantial prejudice to him. We are not persuaded.

"The role of due process protections with respect to pre-accusation delay has been characterized as a limited one. . . . [T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." (Internal quotation marks omitted.) *Slater* v. *Commissioner of Correction*, 158 Conn. App. 522, 536, 119 A.3d 1221, cert. denied, 319 Conn. 932, 125 A.3d 206 (2015). "This court need only determine whether the action complained of . . . violates those fundamental conceptions of justice which lie at the base of our civil and political institutions . . . and which define the community's sense of fair play and decency . . . . The due process clause has not replaced the applicable statute of limitations . . . [as] . . . the primary guarantee against bringing overly stale criminal charges." (Citations omitted; internal quotation marks omitted.) *State* v. *John*, 210 Conn. 652, 685, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); see also *Slater* v. *Commissioner of Correction*, supra, 536. "In order to establish a due process violation because of pre-accusation delay, the

defendant must show both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as where the state seeks to gain a tactical advantage over the defendant. . . . [P]roof of prejudice is generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." (Internal quotation marks omitted.) *State* v. *John*, supra, 685–86. "Mere allegations of potential prejudice or dimmed memory are insufficient." *State* v. *Hanna*, 19 Conn. App. 277, 278, 562 A.2d 549 (1989).

In the present case, the arrest warrant for the defendant for the December 18, 2008 robbery was issued on February 18, 2009. The defendant was taken into custody and transported to Connecticut from Massachusetts by the Enfield Police Department on November 6, 2013. Although approximately four years and eleven months passed from the date of the robbery to the execution of the arrest warrant, and approximately four years and nine months passed from the date of the arrest warrant to its execution, those periods of time standing alone do not require a finding of a due process violation. See *State* v. *Haynes*, 8 Conn. App. 361, 364, 513 A.2d 160 (1986) ("A delay of nearly twenty-one months between the date of the crime and the date of the arrest has been held insufficient to dismiss charges against a defendant, absent a showing of any specific prejudice to the defendant; *State* v. *Aspinall*, 6 Conn. App. 546, 549, 506 A.2d 1063 [1986]; as has a delay of more than five years. *State* v. *Littlejohn*, [199 Conn. 631, 646, 508 A.2d 1376 (1986)].")." The defendant must establish that the passage of time was wholly unjustifiable and caused him actual, substantial prejudice.[8]

The defendant claims that the delay resulted in actual, substantial prejudice because "[a]t trial, the state's primary witness, McVey, revealed that she had no recollection of the suspect or of her conversations with investigating officers in which she described that suspect. McVey's lack of memory deprived defense counsel of the chance to effectively cross-examine [her] . . . regarding her identification." We note, however, that "[a] claim of general weakening of witnesses' memories, relying on the simple passage of time, cannot, without a more specific showing, be said to prejudice the defendant." (Internal quotation marks omitted.) *State* v. *Lacks*, 58 Conn. App. 412, 420, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000); see also *State* v. *Hanna*, supra, 19 Conn. App. 278. Furthermore, because McVey was the state's primary witness, any defect in her memory prejudiced the state, not the defense. See *State* v. *Morrill*, 197 Conn. 507, 528, 498 A.2d 76 (1985). Indeed, "[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses

support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof." *Barker* v. *Wingo*, supra, 407 U.S. 521. As the state points out in its brief, and the record supports, the delay worked to the defendant's advantage, as the defendant's cross-examination of McVey was effective at exposing her memory gaps. McVey's responses to many questions on both direct examination and cross-examination was that she could not recall the events in question.[9]

Additionally, as the trial court pointed out in its memorandum of decision, the defendant's claimed prejudice pertains to concerns generally protected by the applicable statute of limitations.[10] We reiterate that "[t]he due process clause has not replaced the applicable statute of limitations . . . [as] . . . the primary guarantee against bringing overly stale criminal charges." (Internal quotation marks omitted.) *State* v. *John*, supra, 210 Conn. 685.

The defendant has not demonstrated that the state's alleged delay in executing the warrant against him resulted in actual, substantial prejudice to him.[11] See id., 686 ("we cannot find in this record that the defendants have shown, as they must, actual substantial prejudice, such as the death or disappearance of a vital defense witness" [internal quotation marks omitted]). Accordingly, the trial court did not err in denying the defendant's motion to dismiss.

II

The defendant next claims that the court erred in denying his motion to suppress and improperly concluded that the witnesses' identification of him from the suspect photographic array was not the product of an unreliable identification procedure. Specifically, the defendant claims that the photographic array was unnecessarily suggestive and unreliable because "(1) the 'filler' photographs[12] were too dissimilar from the defendant; (2) the defendant was the only individual pictured in apparent prison garb; (3) the array was simultaneous, as opposed to sequential; and (4) the police department did not use a 'double-blind' identification procedure." (Footnote added.) We are not persuaded.

The following additional facts are relevant to this claim. On February 3, 2009, Cooper separately presented to McVey and Lee a photographic array created by Massachusetts State Police Trooper Kevin O'Toole, which contained eight photographs of males of the same race and with similar features. Prior to presenting the array to each witness, Cooper read the following required warning: "You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your [judgment]. You should not conclude or guess that the photographs

contain the picture of the person who committed the crime. You are not obligated to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses or indicate in any way that you have identified someone." Lee and McVey each signed the page from which the warning was read to them, acknowledging that they understood the warning. After viewing the array, each witness selected photograph number three, the photograph of the defendant, and identified him as the perpetrator of the December 18, 2008 robbery at the bank.

On April 21, 2014, the defendant filed a motion to suppress the witnesses' identification of him on the ground that the photographic array was unnecessarily suggestive and unreliable. A hearing on the motion to suppress took place on April 25, 2014. At the hearing, the two witnesses, McVey and Lee, testified. Lee testified that she "was 100 percent certain" of her identification of the defendant as the perpetrator of the robbery when Cooper presented her with the photographic array on February 3, 2009. Lee also testified that her attention was drawn to the defendant for "two reasons; the first reason was, I didn't recognize him as a depositor, and people that don't deposit with us are sales opportunities and we really [have] a strong sales culture, so that was one thing; that's what I'm trained to do. And the other reason why he caught my attention was, he looked just like my husband, and I took a second look and that's why he caught my attention, those two reasons. . . . My husband wears similar glasses, and he had at the time the same mustache and the same skin tone and a very similar build." Defense counsel asked Lee whether she saw any significance in the defendant's clothing, to which she stated that she did not.

McVey testified at the hearing that she recalled describing some of the defendant's features to the police, such as his clothing and his race, but that she could not recall her description of his build or certain facial features. McVey did testify that, at the time of the photographic array, she was "100 percent" certain of her identification of the defendant as the perpetrator of the robbery. McVey stated that she selected the defendant's photograph from the array because "[s]omething just triggered a memory and it was the correct memory. . . . [S]omething about that particular picture just brought the whole thing back." Similar to Lee, McVey testified that she saw no significance in the defendant's clothing.

Following the hearing, on April 28, 2014, the court denied the defendant's motion to suppress. Lee and McVey both testified at trial. In response to the defendant's motion for an articulation, the court issued a written articulation of its decision on October 4, 2016.

"Our standard of review of a trial court's findings and

conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Salmond*, 179 Conn. App. 605, 615–16, 180 A.3d 979, cert. denied, 328 Conn. 936,    A.3d    (2018). "[A] claim of an unnecessarily suggestive pretrial identification procedure is a mixed question of law and fact. . . . [B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Citation omitted; internal quotation marks omitted.) *State* v. *Johnson*, 149 Conn. App. 816, 822, 89 A.3d 983, cert. denied, 312 Conn. 915, 93 A.3d 597 (2014). "[W]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Salmond*, supra, 616; see also *State* v. *Marquez*, 291 Conn. 122, 137–38, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). "[I]f we find that the court incorrectly permitted, as reliable, evidence flowing from an unreliable and unduly suggestive identification procedure, there remains the further issue of whether the ensuing judgment of conviction may be affirmed on the ground that the due process violation was, nevertheless, harmless in light of all the evidence correctly adduced at trial and untainted by the admission of an unreliable identification." (Internal quotation marks omitted.) *State* v. *Day*, 171 Conn. App. 784, 809, 158 A.3d 323 (2017).

On appeal, the defendant claims that his due process rights were violated by the admission of the witnesses' identification of him at trial. "In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the total-

ity of the circumstances." (Internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 141. "The first suggestiveness prong involves the circumstances of the identification procedure itself . . . and the critical question is whether the procedure was conducted in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. . . . If the trial court determines that there was no unduly suggestive identification procedure, that is the end of the analysis, and the identification evidence is admissible. . . . If the court finds that there was an unduly suggestive procedure, the court goes on to address the second reliability prong, under which the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [eyewitness] to view the criminal at the time of the crime, the [eyewitness'] degree of attention, the accuracy of [the eyewitness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Citations omitted; internal quotation marks omitted.) *State* v. *Dickson*, 322 Conn. 410, 421, 141 A.3d 810 (2016), cert. denied,     U.S.    , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). "[A]n out-of-court eyewitness identification should be excluded on the basis of the procedure used to elicit that identification only if the court is convinced that the procedure was so suggestive and otherwise unreliable as to give rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Salmond*, supra, 179 Conn. App. 617.

"In evaluating the [first factor concerning] suggestiveness of a photographic array, a court should look to both the photographs themselves and the manner in which they were presented to the identifying witness. . . . We consider the following nonexhaustive factors in analyzing a photographic array for unnecessary suggestiveness: (1) the degree of likeness shared by the individuals pictured . . . (2) the number of photographs included in the array . . . (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in an impermissible manner . . . (4) whether the eyewitness had been told that the array includes a photograph of a known suspect . . . (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly . . . and (6) whether a second eyewitness was present during the presentation of the array. . . . It is important to note, however, that [p]hotographs will often have distinguishing features. The question . . . is not whether the defendant's photograph could be distinguished from the other photographs . . . but whether the distinction made it unnecessarily suggestive." (Citations omitted; internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 161.

In the present case, the court determined that the identification procedure was not unnecessarily suggestive. In its written articulation of its decision denying the defendant's motion to suppress, the court analyzed the photographic array pursuant to the six factors set forth in *Marquez*. As to the first factor, which addresses the degree of similarity between the individuals in the array, the court noted that "[e]ach person is posed in front of a solid color background which contains no marking for height or other characteristics. Three appear to be some shade of grey, while five, including the defendant at number three, appear white. Each photo appears to be of similarly aged males of the same race with brown eyes. Seven photos, including the defendant's, display some facial hair. While the defendant may have been in prison garb, the defense provided no proof of that. The defendant thoroughly examined . . . Cooper and the two eyewitnesses on that point. During a previous hearing on April 24, 2014, on motions to dismiss, defense counsel made claims about Massachusetts prison garb, but provided no evidence. . . . The tan v-necked shirt is not obvious prison garb with numbers or lettering on it. It is not a luminous orange or yellow color. And most importantly, this court finds that neither eyewitness saw any significance in the shirt's appearance." (Citation omitted.)

As to the second factor, the court noted that "the number of photographs was the standard of eight photographs. While not presented in a sequential, double-blind manner, these photo boards met the standards in effect on February 3, 2009." See *State* v. *Marquez*, supra, 291 Conn. 164 ("the failure to use a double-blind procedure does not automatically render an identification suspect, particularly when, as in the present case, there is no evidence that the detectives conducting the procedure influenced the witnesses in any discernible way prior to their making the identification").

As to the third factor, the court noted that "Cooper was questioned extensively on the procedures he followed, particularly with regard to the composition and timing of the array. Th[e] robbery [at issue in the present case] occurred on December 18, 2008. The defendant was arrested in Massachusetts for other robberies on January 25, 2009. The array was shown to the two eyewitnesses on February 3, 2009. Extensive examination of [Cooper] in several areas of his investigation included possible third-party suspects, composition of the array and witnesses he did not interview. He testified that he relied more on the bank's surveillance photos than on witness descriptions, did not use Connecticut driver's license photos because they cannot be sorted by physical characteristics . . . and did not use Springfield Police Department photos because [they] did not fit [in] Enfield Police Department folders. . . . Instead, [Cooper] used an array composed by . . . O'Toole of

the Massachusetts State Police . . . . The defendant's photo does not conflict with the statement . . . given by . . . McVey except on facial hair, which is also worn by six others depicted in the array. The detective gave no feedback to either eyewitness after the positive identifications. . . . Lee's description was that the perpetrator was African-American, wore glasses, a mustache and a lot of clothing, and looked to be in his thirties with an average build. While [Cooper] was asked to speculate as to the last known mug shot of the defendant available to him, that evidence was never elicited." (Citations omitted.)

As to the fourth factor, the court noted that "the witnesses were not told that a known suspect was in the array. In fact, each was told the opposite and given the approved warnings to that effect . . . . Lee . . . testified at the motion to suppress [hearing] that she was behind the teller line when she first saw the perpetrator from a distance, whom she did not recognize as a depositor but at first took to be her husband until apparently dissuaded by the team logo on his [baseball] cap. She further testified that [Cooper] showed her the array when only they were in her office and after he had given and she signed [the standard warning]. The only difference between the picture and the robber was an absence of eyeglasses. [Lee testified that she] was '100 [percent]' sure of her identification. . . . McVey testified at the hearing that she had been trained to hand over the money and to remember the perpetrator. She was shown a copy of the same photo array [as Lee] and selected the defendant. While [McVey] did not recall her level of certainty at the time of the identification, at the hearing she was '100 [percent]' sure. . . . McVey was also given the standard warning . . . . She testified that as to photo number three in the array, 'something just triggered a correct memory.' "

As to the fifth factor, "neither eyewitness was presented with multiple arrays repeating the suspect's photo. Similarly, the sixth factor was not violated, as each witness was shown the array in the presence of . . . Cooper only in attendance." Having concluded that the identification procedure was not unnecessarily suggestive, the court did not reach the second prong of reliability but concluded that the month and one-half delay "goes to the weight of the identification, not the fairness of the procedure, and would not change this court's opinion even if the [reliability based] totality of [the] circumstances prong were reached."

On the basis of our review of the record, we find ample support for the court's findings. We cannot conclude that the photographs in the array were too dissimilar. During the April 25, 2014 motion to suppress hearing, both Lee and McVey testified that they were "100 percent" certain of their photographic array identification of the defendant as the perpetrator of the rob-

bery, and neither testified that they considered the photographs to be dissimilar. The photographic array was admitted as an exhibit, and the photographs in the array depict similarly aged males of the same race with brown eyes, all posed in front of a solid color background.

We are not persuaded by the defendant's claim that, at trial, McVey found every photograph aside from the defendant's "to be dissimilar from her recollection of the suspect either because of age, face shape and/or skin color." McVey did not testify that she found the photographs to be dissimilar. Instead, consistent with her testimony on direct examination, McVey testified on cross-examination that she selected the defendant's photograph because of his "eyes."[13] She identified him in the array because "[h]is eyes were what determined it for me." Although McVey agreed with defense counsel that there were differences among the photographs, at no point did she testify, nor was she asked to comment on, whether she found the photographs too dissimilar. Importantly, "[p]hotographs will often have distinguishing features. The question . . . is not whether the defendant's photograph could be distinguished from the other photographs . . . but whether the distinction made it unnecessarily suggestive." (Internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 161.

We also cannot conclude that the court erred in determining that the defendant was not pictured in apparent prison garb. The photograph of the defendant in the array depicts him wearing a tan v-neck shirt that is not bright in color or imprinted with any insignia. Both Lee and McVey testified at the motion to suppress hearing that they did not see any significance in the defendant's shirt.

Additionally, we are not persuaded by the defendant's argument that the absence of a sequential, double-blind photographic array rendered the identification procedure unnecessarily suggestive.[14] As the defendant concedes in his principal brief, "Cooper was not required by statute to utilize the double-blind, sequential procedure in 2010," but the defendant nevertheless argues that "studies were already out and ongoing at that time, which indicated that these procedures were the best practices for law enforcement." The defendant contends that "[t]he identification methods that Cooper used . . . put [him] in a position to purposefully or inadvertently provide confirmatory feedback that could have influenced the witnesses' confidence in their identifications," and that "[t]his could have been avoided by using a sequential array [and] . . . by sending another officer to the bank."

Although we recognize that a sequential, double-blind procedure now is mandated pursuant to General Statutes § 54-1p,[15] it was not the required procedure in 2009, when the photographic array was presented to the wit-

nesses in this case. See *State* v. *Marquez*, supra, 291 Conn. 164 ("the failure to use a double-blind procedure [did] not automatically render an identification suspect, particularly when . . . there is no evidence that the [police officer] conducting the procedure influenced the witnesses in any discernible way prior to their making the identification"); *State* v. *Outing*, 298 Conn. 34, 49, 3 A.3d 1 (2010) ("[a] simultaneous photographic array is not unnecessarily suggestive per se, however, even if it was not administered in a double-blind procedure"), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). The defendant does not argue that § 54-1p applies retroactively, but maintains that he was prejudiced by the procedure utilized by Cooper. This court previously has rejected a similar claim. In *State* v. *Johnson*, supra, 149 Conn. App. 821, this court rejected the defendant's argument that "[t]he absence of double-blind, sequential arrays makes a photo array unduly suggestive"; (internal quotation marks omitted); where the eyewitness identification was made in 2009, prior to the requirement that a sequential, double-blind procedure be utilized. This court upheld the trial court's application of the law in effect at the time of the identification and rejected the defendant's claim that "a non-double-blind photographic array procedure, per se, is unduly suggestive." Id., 829. We similarly reject the defendant's claim in the present case that the absence of a sequential, double-blind procedure per se rendered the identification unnecessarily suggestive.[16]

Even if we assume, arguendo, that the photographic array procedure was unduly suggestive, the identification nevertheless would be reliable on the basis of the totality of the circumstances. See *State* v. *Dickson*, supra, 322 Conn. 421 ("[i]f the court finds that there was an unduly suggestive procedure, the court goes on to address the second reliability prong, under which the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [eyewitness] to view the criminal at the time of the crime, the [eyewitness'] degree of attention, the accuracy of [the eyewitness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]" [internal quotation marks omitted]). As the defendant concedes, "McVey and Lee saw the robber up close, and in a well lit room." Additionally, McVey accurately described the defendant in her sworn statement to the police, and her description matched the depiction of the perpetrator in the bank surveillance photographs. Lee and McVey both testified that they were 100 percent certain at the time of the identification that the defendant was the perpetrator. The identification in February, 2009, was made close in time to the December, 2008 robbery. Thus, even if there was an unduly suggestive procedure, which we conclude there was not, the defendant's claim would fail under the

second reliability prong. See *State* v. *Marquez*, supra, 291 Conn. 141. On the basis of the foregoing, we conclude that the court did not err in denying the defendant's motion to suppress the eyewitnesses' identification of him.

### III

The defendant claims that "[t]he jury charge on identification . . . failed to provide an in-depth explanation of factors that have a negative impact on witness identification and . . . incorrectly excluded instructions necessary to assist the triers of fact in assessing the accuracy of eyewitness perception and credibility." Specifically, the defendant contends that he was deprived of a fair trial because the jury instructions were incomplete, as several of the factors from *State* v. *Guilbert*, 306 Conn. 218, 245, 49 A.3d 705 (2012), that he included in his request to charge were missing or not explained in sufficient depth. We are not persuaded.

The following additional facts and procedural history are relevant to this claim. On April 30, 2014, the defendant filed a request to charge. A charging conference began that same day and continued on the morning of May 1, 2014. Discussion at the conferences centered on the defendant's request to charge on eyewitness identification. The jury was instructed on May 1, 2014. Following the instructions, the court asked the parties if they had any exceptions to the charge. The state had none. Defense counsel stated to the trial court that he "appreciate[d] [that] the court gave . . . in substance what I requested" for the jury instructions, and he then went on to clarify that he was not making additional exceptions "other than what we had already argued about yesterday in terms of crafting the identification instructions. . . . I still don't mean to abandon any of the . . . arguments that . . . I made . . . yesterday . . . ."

"Our Supreme Court has held that identification instructions are not constitutionally required and [e]ven if [a] court's instructions were less informative on the risks of misidentification . . . the issue is at most one of instructional error rather than constitutional error. A new trial would only be warranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled. . . . The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Day*, supra, 171 Conn. App. 831.

"We review nonconstitutional claims of instructional error under the following standard. While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise

letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) Id., 831–32. "A challenge to the validity of jury instructions presents a question of law over which this court has plenary review." (Internal quotation marks omitted.) *State* v. *Holley*, 174 Conn. App. 488, 493–94, 167 A.3d 1000, cert. denied, 327 Conn. 907, 170 A.3d 3 (2017), cert. denied,      U.S.     , 138 S. Ct. 1012, 200 L. Ed. 2d 275 (2018).

The defendant claims that the following requested *Guilbert* factors were omitted or understated in the jury instructions: "there is at best a weak correlation between a witness' confidence in his or her identification and its accuracy"; *State* v. *Guilbert*, supra, 306 Conn. 237; "identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure"; "witnesses are prone to develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification"; and "the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." Id., 238–39. To the extent that the defendant suggests that the *Guilbert* factors are required in the jury instructions, we reject that argument. As an initial matter, *Guilbert* concerned the admissibility of expert testimony, not a challenge to jury instructions. Although the court in *Guilbert* did acknowledge the "widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror"; (internal quotation marks omitted) *State* v. *Grant*, 154 Conn. App. 293, 311, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015); it did not mandate that such factors be included in jury instructions. See footnote 16 of this opinion. In fact, in *Guilbert*, the court even noted that jury instructions are less effective than expert testimony, stating that "research has revealed that jury instructions that direct jurors in broad terms to exercise caution in evaluating eyewitness identifications are less effective than expert testimony in apprising the jury of the potential unreliability of eyewitness identification testimony." *State* v. *Guilbert*, supra, 245. The court in the present case expressed its concern that, for the requested instructions to be provided in the charge, an expert, which the defendant did not offer during the trial, would be needed to explain eyewitness identification issues and principles to the jury. It is undisputed that neither party presented expert testimony at trial regarding such eyewitness identification issues and principles.

Certainly, while the court is not required to tailor its instructions to the exact request of a party for a specific instruction, "broad, generalized instructions on eyewitness identifications . . . do not suffice." (Citations omitted.) Id., 258. As set forth in the subsequent paragraphs, we conclude that the substance of the defendant's requested instructions was given to the jury and that the instructions were neither overbroad nor overgeneralized.

As to his claim regarding double-blind procedure, the defendant requested the following language: "A law enforcement officer who knows which photo is of the suspect may intentionally or unintentionally convey that knowledge to the witness. That increases the chance that the witness will identify the suspect, even if the suspect is innocent. For that reason, whenever possible, photo arrays should be conducted by an officer who does not know the identity of the suspect. If a police officer who does not know the suspect's identity is not available, then the officer should not see the photos as the witness looks at them. In this case, there has been testimony that Detective Cooper knew the identity of the suspect. It is also alleged that Detective Cooper did not compensate for that by conducting a procedure in which he did not see the photographs as the witnesses looked at them." (Footnote omitted.) The court gave the following instruction: "A law enforcement officer who knows which photo is of the suspect may intentionally or unintentionally convey that knowledge to the witness. . . . In this case, the identification procedure utilized by Detective Cooper involved showing all eight photographs at the same time in the array to each witness. You may consider whether the witness was comparing each photograph in the array to one another or each photograph in the array to her own memory in making an identification." The jury also was instructed that "[f]eedback occurs when police officers signal to eyewitnesses that they correctly identified the suspect. Feedback may be either verbal or nonverbal. Feedback may reduce doubt and engender or produce a false sense of confidence in a witness." Thus, the defendant's requested instruction, in substance, was given.[17]

As to the defendant's claim regarding unconscious transference, he did not include an instruction on unconscious transference in his request to charge.[18] He did, however, ask for the court to include such an instruction at the April 30, 2014 charging conference, and again on May 1, 2014. The court did not include an instruction on unconscious transference. The defendant argues that this was error and that an instruction on unconscious transference was necessary because Lee testified that the defendant looked just like her husband, and there were no experts to point out the potential problems with unconscious transference. As

previously discussed in this opinion, the court in *Guilbert* noted that "research has revealed that jury instructions that direct jurors in broad terms to exercise caution in evaluating eyewitness identifications are less effective than expert testimony in apprising the jury of the potential unreliability of eyewitness identification testimony." *State* v. *Guilbert*, supra, 306 Conn. 245. No experts testified in the present case, and the court expressed its reluctance to instruct on scientific theories and studies where the defendant did not offer expert testimony. The court did not err in omitting an instruction on unconscious transference. There was no evidence at trial to establish that unconscious transference could be an issue for the jury to consider, and the defendant provided no authority for the proposition that such an instruction was required. The defendant could have offered an expert to testify at trial as to unconscious transference, but he did not do so.

As to the charge on eyewitness identification, the differences in the defendant's request to charge and the jury instruction were minimal.[19] The court did not use the following requested language: "You may consider that eyewitnesses are often not able to accurately recall the source of their memories. In other words, their belief that the identification was based on observations at the time of the offense may be wrong. When a witness makes an identification, that witness is expressing an opinion that may be accurate or may be inaccurate. . . . Eyewitness misidentification is the single greatest source of wrongful convictions in the United States." The court gave, in substance, what the defendant requested by including in the instruction similar language to what it omitted from his request, including that "[e]yewitnesses can be truthful but mistaken. The identifications must be analyzed critically. Human memory is not foolproof. . . . [B]e advised that a [witness'] level of confidence, standing alone, may not be an indication of the reliability of the identification."

The defendant also requested the following instruction regarding the impact of the passage of time on memory: "Memories fade with time. As a result, delays between the commission of a crime and the time an identification is made can affect the reliability of the identification. In other words, the more time that passes, the greater the possibility that a witness's memory of a perpetrator will weaken or be influenced by post-event information." The court omitted only the last sentence of the request, which, again, was in substance what the defendant requested.

We reiterate that the court, in its discretion, need "not tailor its charge to the precise letter" of the defendant's request. (Internal quotation marks omitted.) *State* v. *Day*, supra, 171 Conn. App. 831. "Significantly, our Supreme Court in *Guilbert* emphasized that a trial court retains the discretion to decide whether, under the spe-

cific facts and circumstances presented, focused and informative jury instructions on eyewitness testimony are warranted. . . . In reviewing the discretionary determinations of a trial court, every reasonable presumption should be given in favor of the correctness of the court's ruling." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Faust*, 161 Conn. App. 149, 189 n.11, 127 A.3d 1028 (2015), cert. denied, 320 Conn. 914, 131 A.3d 252 (2016). The jury instructions were correct in law, adapted to the issue of eyewitness identification, and sufficient to guide the jury. See *State* v. *Day*, supra, 832. Accordingly, the jury instructions given by the court were not improper.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-134 (a) provides in relevant part that "[a] person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

[2] General Statutes (Rev. to 2007) § 53a-124 (a) provides that "[a] person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds one thousand dollars . . . ." All references herein to § 53a-124 refer to the 2007 revision of the statute, the revision in effect on the date of the crimes.

[3] The defendant also asserted in his motion to dismiss that the arrest warrant application contained multiple misrepresentations and material omissions that entitled him to a dismissal pursuant to Practice Book § 41-8 (1) and (9). The defendant has not challenged on appeal the court's dismissal of this claim.

[4] The defendant pleaded guilty to seven counts of robbery in Massachusetts, and he was sentenced on July 23, 2010, to ten to twelve years of incarceration.

[5] In that letter, the defendant stated, in relevant part: "Now comes Darren Crosby, the defendant acting pro-se in the above captioned matter, and respectfully moves the Honorable Court, pursuant to Rule 36, Mass. R. Crim. P., to schedule a trial or other disposition in this action without further delay. The defendant is presently incarcerated within the Massachusetts Department of Correction at MCI Cedar Junction Walpole."

[6] We note that the defendant did not pursue a claim that his right to be brought to trial within 180 days of notice of the detainer was violated and explicitly waived such a claim before the trial court.

[7] Specifically, the court noted that "[t]he defendant contends that the delay in his case adversely affected him personally by creating prolonged angst and uncertainty as to the outstanding charges and their effect on his term of imprisonment in Massachusetts. Although the uncertainty surrounding pending charges may surely generate feelings of anxiety, the defendant failed to provide any direct evidence that he suffered in this way. . . . The defendant also failed to introduce any evidence regarding the effect, if any, the pending Connecticut charges had on the conditions of his physical incarceration or on his ability to participate in rehabilitation programs while incarcerated in Massachusetts. As for the defendant's claims that the fading memories of the witnesses were exacerbated by the delay, [r]elying on the simple passage of time, cannot, without a more specific showing, be said to prejudice the defendant any more than the state. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. . . . Finally, the defendant again asserts that the delay hampered his defense due to the change in his appearance from the date of the offense to the time of trial. The court has already addressed that aspect of the defendant's prejudice claim and has determined it is unsupported by the evidence." (Citations omitted; internal quotation marks omitted.)

[8] The defendant cites to *State* v. *Soldi*, 92 Conn. App. 849, 857, 887 A.2d

436, cert. denied, 277 Conn. 913, 895 A.2d 792 (2006), for the proposition that "once a defendant puts forth evidence to suggest that [he] was not elusive, was available and was readily approachable, the burden shifts to the state to prove that the delay in executing the warrant was not unreasonable." As the trial court indicated in its memorandum of decision, however, *Soldi* is inapplicable to the present case.

The decision in *Soldi* and subsequent cases citing *Soldi* make clear that this burden shifting rule applies in the context either of a warrant for violation of probation or a warrant executed outside of the statute of limitations. See, e.g., *State* v. *Swebilius*, 325 Conn. 793, 803–804, 159 A.3d 1099 (2017) (warrant executed outside statute of limitations period); *State* v. *Woodtke*, 130 Conn. App. 734, 736, 25 A.3d 699 (2011) (same); *State* v. *Pittman*, 123 Conn. App. 774, 775, 3 A.3d 137 (delay in executing warrant charging defendant with violation of probation), cert. denied, 299 Conn. 914, 10 A.3d 530 (2010). Neither of those circumstances is present in this case, as the arrest warrant was not for a violation of probation, and the warrant was executed within the five year statute of limitations. See footnote 10 of this opinion.

Instead, the defendant has the burden of establishing "both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as where the state seeks to gain a tactical advantage over the defendant." (Internal quotation marks omitted.) *State* v. *John*, supra, 210 Conn. 685–86; see also *Slater* v. *Commissioner of Correction*, supra, 158 Conn. App. 536–37 (applying two-pronged test set forth in *John*); *State* v. *Santos*, 108 Conn. App. 250, 263, 947 A.2d 414 (2008) ("[t]he law is quite clear that [i]n order to establish a due process violation because of pre-accusation delay, the defendant must show both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as where the state seeks to gain a tactical advantage over the defendant" [internal quotation marks omitted]).

[9] We also reject the defendant's claim that the delay resulted in actual, substantial prejudice because "McVey's and Lee's identifications of the defendant were the only evidence in the case that placed the defendant in the Webster Bank during the robbery" and their lack of memory at trial impacted the defense. This argument ignores the fact that there was other evidence presented at trial from which the jury could determine the defendant's guilt, including surveillance photographs of the defendant on the day of the robbery at the bank and at another bank where he was dressed in the same attire. Evidence of the defendant's guilty plea to a robbery in East Longmeadow, Massachusetts, was not admitted at trial; thus, the jury was told that the images from the East Longmeadow bank were from a commercial establishment. The jury reviewed these photographs during its deliberations.

[10] As the court noted in its memorandum of decision, "[t]here is a five year statute of limitations for the offenses charged in the defendant's case. . . . The Webster Bank robbery occurred on December 18, 2008. The defendant was arrested on November 6, 2013—which is within the five year limitation period. Thus, the defendant had adequate protections against the disadvantages to an accused attending stale prosecutions . . . ." (Citations omitted; internal quotation marks omitted.)

[11] Because we conclude that the first prong of *John* has not been satisfied, we need not consider whether the state's delay was wholly unjustifiable under the second prong of *John*. See *State* v. *John*, supra, 210 Conn. 685–86.

[12] " 'Filler' means either a person or a photograph of a person who is not suspected of an offense and is included in an identification procedure." General Statutes § 54-1p (a) (5).

[13] At trial, the following examination took place:

"[Defense Counsel]: Now, you knew the individual that had—the perpetrator, the individual who robbed you, had a relatively thin apparent face, correct? Long and narrow?

"[McVey]: I would say it was the eyes.

"[Defense Counsel]: Well, you knew the face was long and narrow, right?

"[McVey]: Okay. Yes.

"[Defense Counsel]: Okay. All right. Let's—let's look at the array. You said you looked through all the pictures, right?

"[McVey]: Yes.

"[Defense Counsel]: Okay. Showing you what's been admitted as state's [exhibit] 11. Excuse me while I get my copy. So, there—the person, in number one, his face isn't exactly long and narrow, is it?

"[McVey]: No.

"[Defense Counsel]: Okay. And you look at—you looked at all these, you said?

"[McVey]: I did.

"[Defense Counsel]: Okay. Number two, he's a little on the young side, right?

"[McVey]: I guess.

"[Defense Counsel]: Okay. Do you remember giving a sort of age description of the person?

"[McVey]: No.

"[Defense Counsel]: Okay. Number three, we've already talked about, right?

"[McVey]: Yes.

"[Defense Counsel]: Number four, he's a little too light skin and his face is wrong, right?

"[McVey]: Yes.

"[Defense Counsel]: Okay. And number five, he might be the right complexion, but his face is wrong, too, right?

"[McVey]: Right.

"[Defense Counsel]: Number six, his face is long and narrow, right?

"[McVey]: Correct.

"[Defense Counsel]: But his complexion is a little on the light side from what you saw, right?

"[McVey]: It has nothing to do with the complexion.

"[Defense Counsel]: I understand. But he's fairly—

"[McVey]: It was the eyes.

"[Defense Counsel]: I understand that's your testimony—

"[McVey]: Uh-huh.

"[Defense Counsel]: —please answer my question.

"[McVey]: Okay.

"[Defense Counsel]: Number seven, again, face is wrong, right?

"[McVey]: Uh-huh.

"[Defense Counsel]: And number eight, again, sort of long and narrow, but, again, a little bit light—more lightly reflected than number three, right?

"[McVey]: Correct."

[14] "A double-blind photographic identification procedure is one in which the officer conducting [the procedure] has not been involved in the investigation and does not know who the target is." (Internal quotation marks omitted.) *State* v. *Patterson*, 170 Conn. App. 768, 772 n.1, 156 A.3d 66, cert. denied, 325 Conn. 910, 158 A.3d 320 (2017). Because Cooper knew that the defendant was a suspect when he presented the photographic array to the witnesses, the procedure was not double-blind.

"A sequential photographic identification procedure involve[s] showing the witness the suspect and other fillers on the identification procedure one at a time, rather than the traditional practice of simultaneous presentation." (Internal quotation marks omitted.) Id., 772 n.2. Because eight photographs were presented to the witnesses simultaneously, the procedure was not sequential.

[15] General Statutes § 54-1p (c) provides in relevant part that "[n]ot later than May 1, 2013, each municipal police department and the Department of Emergency Services and Public Protection shall adopt procedures for the conducting of photo lineups . . . that comply with the following requirements: (1) Whenever a specific person is suspected as the perpetrator of an offense, the photographs included in a photo lineup . . . shall be presented sequentially so that the eyewitness views one photograph . . . at a time . . . (2) The identification procedure shall be conducted in such a manner that the person conducting the procedure does not know which person in the photo lineup . . . is suspected as the perpetrator of the offense, except that, if it is not practicable to conduct a photo lineup in such a manner, the photo lineup shall be conducted by the use of a folder shuffle method, computer program or other comparable method so that the person conducting the procedure does not know which photograph the eyewitness is viewing during the procedure . . . ."

[16] We also are not persuaded by the defendant's reliance on *Guilbert* for the proposition that "identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure . . . ." *State* v. *Guilbert*, 306 Conn. 218, 238 n.39, 49 A.3d 705 (2012). This court previously has corrected a defendant's statement that *Guilbert* stands for such a proposition, noting that "[t]he principal issue before the court in *Guilbert* was not whether any particular identification procedures are constitutionally mandated, but whether courts are obligated to admit under specified circum-

stances qualified expert testimony concerning the fallibility of eyewitness identification under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to aid juries in their evaluation of identification evidence. . . . The court in *Guilbert* acknowledged 'widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror. . . .' In particular, the court mentioned that '[c]ourts across the country now accept that [among other things] . . . identifications are likely to be less reliable in the absence of a double-blind, sequential identification procedure . . . .' (Citations omitted.) *State* v. *Grant*, 154 Conn. App. 293, 311, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

"*Nothing in Guilbert, however, suggests that if the police show the photographs to the witness simultaneously and the procedure is administered by an officer who knows the identity of the suspect, the procedure is unnecessarily suggestive as a matter of law.* In ruling that experts in appropriate circumstances should be allowed to testify about issues that may affect the accuracy of identifications, the court was not concerned with the admissibility of identification evidence, but rather with a jury's proper exercise of its duty to evaluate the weight to be given to a particular eyewitness' identification." (Emphasis added and omitted.) Id.

[17] Despite the fact that the charge was in substance given, the defendant argues that the double-blind instruction "does not further instruct [on] the desirability of the 'double-blind' procedure . . . ." The court explained that it excluded such language because it determined that it was prejudicial to the state. The court expressed its concern that a double-blind procedure was not required in 2009 and that, to include the defendant's requested language, the jury may assume that Cooper employed the wrong procedure. See *State* v. *Johnson*, supra, 149 Conn. App. 821; see also *State* v. *Grant*, supra, 154 Conn. App. 311. We reiterate that the court's instructions must "fairly and adequately present the case to a jury in such a way that injustice is not done to *either party* under the established rules of law." (Emphasis added; internal quotation marks omitted.) *State* v. *Day*, supra, 171 Conn. App. 831.

[18] "[U]nconscious transference . . . occurs when a person seen in one context is confused with a person seen in another." *State* v. *Guilbert*, supra, 306 Conn. 253–54.

[19] In his request to charge, the defendant requested the following language: "It is your function to determine whether the witnesses' identifications of the defendant are reliable and believable, or whether they are based on a mistake or for any reason are not worthy of belief. You may consider that eyewitnesses are often not able to accurately recall the source of their memories. In other words, their belief that the identification was based on observations at the time of the offense may be wrong. When a witness makes an identification, that witness is expressing an opinion that may be accurate or may be inaccurate. Eyewitnesses can be truthful but mistaken. Eyewitness misidentification is the single greatest source of wrongful convictions in the United States. Even where a witness believes that his or her testimony is accurate, it is your function to determine whether the witness' identification of the defendant is reliable, or whether it is based on a mistake or for any reason is not worthy of belief.

"Human memory is not foolproof. Research has revealed that human memory is not like a video recording that a witness need only replay to remember what happened. Memory is far more complex. The process of remembering consists of three stages: acquisition—the perception of the original event; retention—the period of time that passes between the event and the eventual recollection of a piece of information; and retrieval—the state during which a person recalls stored information. At each of these stages, memory can be affected by a variety of factors.

"Relying on some of the research that has been done, I will instruct you on specific factors you should consider in this case in determining whether the eyewitness identification evidence is reliable. In evaluating these identifications, you should consider the observations and perceptions on which each identification was based, the witnesses' ability to make those observations and perceive events, and the circumstances under which the identifications were made. Although nothing may appear more convincing than a witness' categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness' level of confidence, standing alone, may not be an indication of

the reliability of the identification." (Footnotes omitted.)

———————————————