******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* BILLY RAY JONES
(AC 41584)

DiPentima, C. J., and Alvord and Eveleigh, Js.

*Syllabus*

Convicted of the crimes of murder, carrying a pistol without a permit and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed. On appeal, he claimed, inter alia, that the trial court erred in its charge to the jury by failing to provide a special credibility instruction with respect to a witness, S, regarding the jailhouse informant exception to the general rule that a criminal defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely. S was incarcerated at the time he provided certain information to the police about a confession the defendant had made to him the day after the shooting while they were watching television, and in consideration for talking to the police about the defendant's confession and what he had seen on the night of the shooting incident, S was released from jail without having to make a bond payment and later received a favorable sentence on his felony charge. *Held*:

1. The trial court did not err in denying the defendant's request for a special credibility instruction regarding jailhouse informants with respect to the testimony of S: although S was incarcerated when he initiated contact with the police, he was not a jailhouse informant, as he testified about events that he had witnessed and a confession that took place while he and the defendant were socializing outside of the prison environment, and he was not a fellow inmate of the defendant and did not testify as to a confession that the defendant made while they were fellow inmates, and although the defendant, who conceded that S was not a jailhouse informant, claimed that S's testimony was similar to that of a jailhouse informant, this court declined to extend to the present case the jailhouse informant exception, which applies only where a prison inmate has been promised a benefit by the state in return for his or her testimony regarding incriminating statements made by a fellow inmate; moreover, the jury was aware of S's involvement in the criminal justice system and his expectation that he would receive consideration in exchange for talking to the police, and, therefore, the general credibility instruction given by the trial court was sufficient.

2. The defendant's claim that the trial court erred with respect to its jury instruction on eyewitness identification was unavailing; it was not reasonably probable that the jury was misled by the court's instructions, as two witnesses who had made identifications of the defendant knew the defendant prior to seeing him on the night of the crime, and, as a result, their identifications of the defendant did not give rise to the risk of misidentification that the defendant's requested instructions were specifically designed to address, and the trial court properly tailored the instructions to adapt to the issues of the case.

Argued November 28, 2018—officially released February 5, 2019

*Procedural History*

Two part information charging the defendant, in the first part, with the crimes of murder and carrying a pistol without a permit, and, in the second part, with criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Kavanewsky, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with

whom, on the brief, were *John C. Smriga*, state's attorney, and *Michael A. DeJoseph*, *Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Billy Ray "BJ" Jones, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a), carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a). On appeal, the defendant claims that the trial court erred in its charge to the jury by failing to provide (1) a special credibility instruction and (2) a specific instruction on the dangers of eyewitness identification. We disagree, and accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On June 21, 2010, the defendant was outside of the Charles F. Greene Homes housing complex (Greene Homes), a federally funded housing project located in Bridgeport. The victim, Michael "Booman" Williams, and several other people, including children, were in the playground area of the Greene Homes. Just before 11 p.m., the defendant approached the victim from behind while in the playground area and shot at the victim at least twice, killing him.[1]

Martin Vincze, a Bridgeport police officer, responded to a 911 call that had reported the shooting. When Officer Vincze arrived at the Greene Homes, he found the victim lying on the ground with a gunshot wound to the head. Although there were twenty to thirty people at the scene, only one person was willing to speak to Officer Vinzce.[2] James Kennedy, a Bridgeport police detective, recovered a nine millimeter spent cartridge casing from the playground area.

On June 22, 2010, the following day, the defendant was with Larry Shannon watching television at the Marina Village housing project in Bridgeport. A news story about the shooting came onto the television, at which point the defendant confessed to Shannon. The defendant, while holding a nine millimeter Ruger handgun,[3] told Shannon that he had walked up to the victim, said "what's poppin' now?," then fired his gun.

On June 25, 2010, John Tenn, a Bridgeport police detective, questioned the defendant about the victim's death. The defendant told Detective Tenn that he did not know the victim and had never heard the name "Booman." In addition, the defendant stated that he was with Benjamin Beau at the Washington Village housing complex in Norwalk on the night of June 21, 2010. Later that same day, however, Detective Tenn questioned Chanel Lawson, the mother of the defendant's son, who lived in the Greene Homes. Lawson told Detective Tenn that the defendant knew the victim. A few weeks later, Beau was questioned by Detective Tenn and denied being with the defendant on the night of June 21, 2010.[4]

In September, 2012, over two years later, police offi-

cers approached Angela Teele while she was at work and asked to speak to her about the defendant.[5] Teele had lived in the Greene Homes in June, 2010, and had witnessed the defendant shoot the victim. Specifically, Teele recalled seeing the defendant in the vicinity of building three of the Greene Homes between 10 and 11 p.m. on the night of June 21, 2010.[6] She observed that the defendant was wearing a black hoodie and blue shorts. Teele also recalled seeing the victim play with two children in the playground area of the Greene Homes, which was located at the side of building three. Teele briefly lost sight of the defendant as he walked around one of the buildings, then watched him throw on his hood as he went into the playground area. Once the defendant went into the playground area, Teele witnessed the defendant approach the victim, whose back was turned, and shoot the victim in the head.[7] Teele observed that the defendant was about two or three feet away from the victim when he shot the victim with a pistol. Teele saw the defendant run out of the playground area toward the back of building three after the shooting.

In February, 2013, Shannon contacted the police. Although Shannon previously had not wanted to talk to the police,[8] he was arrested and incarcerated on an unrelated felony charge and sought to give information to police in the hope of receiving favorable treatment in his case. In addition to telling the police about the defendant's confession, Shannon also explained that he saw the defendant on the night of June 21, 2010. Shannon was at the Greene Homes and walked to Junco's, a nearby market, to get food. After eating at Junco's, Shannon walked back toward building four of the Greene Homes. During his walk back, Shannon saw the defendant in the area between buildings two and three. He observed that the defendant was wearing blue jeans and a hoodie, with the hood up on his head, and was walking toward the back of building three. After seeing the defendant, Shannon continued to walk toward building four, and shortly thereafter heard two or three gunshots. Shannon tried to run because he did not know where the gunshots were coming from, but he had difficulty running due to a recent surgery, and ended up falling to the ground. Shannon got up, walked around the corner of building four, and saw the victim slumped over in the playground area.

In June, 2015, the defendant was arrested, and he was subsequently charged with murder, carrying a pistol without a permit, and criminal possession of a firearm. A jury trial followed and the defendant was found guilty of all charges. The court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of fifty years of imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court erred when it failed to provide a special credibility instruction regarding Shannon's testimony. Specifically, the defendant argues that the jailhouse informant instruction, recognized in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), should extend to cases like his, where a witness such as Shannon is incarcerated at the time he provides information to the police for the purposes of getting out of jail and receiving a favorable disposition of his pending criminal charges.[9] We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. At trial, Shannon was questioned at length about the benefits he received as a result of talking to police and testifying at the defendant's trial. Shannon explained that he decided to talk to the police in February, 2013, because he had been arrested on an unrelated felony charge and was being held at the Bridgeport Correctional Center. Shannon testified that, in consideration for talking to the police about the defendant's confession and what he had seen on the night of June 21, 2010, he was released from the Bridgeport Correctional Center without having to make a bond payment. In addition, Shannon stated that he received a favorable sentence on his felony charge.[10]

On January 23, 2017, the defendant submitted a written request to charge. He requested a special credibility instruction with respect to Shannon's testimony.[11] The defendant conceded that there was no controlling legal authority requiring such an instruction, but nonetheless argued, as he does on appeal, that the jailhouse informant exception recognized in *Patterson* should extend to cases such as his. Specifically, he argued that "Larry [Shannon's testimony] is no less suspect than the testimony of an accomplice or jailhouse snitch, given the unique circumstances of how and when it was disclosed, and the potential motivations for the witness to provide information he believes will be helpful to the state regardless of whether that information is accurate or based on personal knowledge."

The trial court declined to provide the jury with the special credibility instruction. Rather, in its final charge to the jury, the court provided the jury with a general witness credibility instruction. The court instructed in relevant part: "You should consider their appearance, conduct and demeanor while testifying and in court, and any interest, bias, prejudice or sympathy which a witness may apparently have for or against the state, or the accused or in the outcome of the trial. . . ."

We turn to the legal principles that guide our review of the defendant's claim. "It is a well established principle that a defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . The primary purpose of the

charge to the jury is to assist [it] in applying the law correctly to the facts which [it] find[s] to be established. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Salmond*, 179 Conn. App. 605, 627–28, 180 A.3d 979, cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018).

"Generally, a [criminal] defendant is not entitled to an instruction singling out any of the state's witnesses and highlighting his or her possible motive for testifying falsely." *State* v. *Ortiz*, 252 Conn. 533, 561, 747 A.2d 487 (2000); accord *State* v. *Colon*, 272 Conn. 106, 227, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). Our Supreme Court has recognized three exceptions to this general rule, including the jailhouse informant exception. See *State* v. *Diaz*, 302 Conn. 93, 101–102, 25 A.3d 594 (2011).

Our Supreme Court adopted the jailhouse informant exception in *Patterson*, holding that a defendant is entitled to a special credibility instruction in cases where a prison inmate "has been promised a benefit by the state in return for his or her testimony" regarding incriminating statements made *by a fellow inmate*. *State* v. *Patterson*, supra, 276 Conn. 469; see also *State* v. *Diaz*, supra, 302 Conn. 102 ("a jailhouse informant is a prison inmate who has testified about confessions or inculpatory statements made to him *by a fellow inmate*" [emphasis added]).

"In *Diaz*, our Supreme Court declined to interpret its decision in *Patterson* as [requiring] a special credibility instruction when an incarcerated witness has testified concerning events surrounding the crime that [he] witnessed outside of prison . . . reasoning that such an exception would swallow the rule that the trial court generally is not required to give such an instruction for the state's witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Salmond*, supra, 179 Conn. App. 630.

In the present case, the defendant concedes that Shannon was not a jailhouse informant. Although Shannon was incarcerated at the Bridgeport Correctional Center when he initiated contact with the police, he was not a fellow inmate of the defendant. Shannon did not testify as to a confession that the defendant made while they were fellow inmates. See *State* v. *Diaz*, supra, 302 Conn. 102 ("*Patterson* has not been applied to require a special credibility instruction when an incarcerated witness has testified concerning events surrounding the crime that he or she witnessed outside of

prison, as distinct from confidences that the defendant made to the witness while they were incarcerated together"). Rather, Shannon testified about events that he had witnessed and a confession that took place while both of them were socializing outside of the prison environment.

Moreover, the defendant recognizes that requiring a special credibility instruction for Shannon's testimony would be an expansion of the exception recognized in *Patterson*. The defendant nonetheless argues that, although a special credibility instruction is not required under existing law, the trial court's failure to provide such an instruction was in error because Shannon's testimony was "similar to [that of] a classic jailhouse informant," and presented "[t]he same concerns that require . . . [a] special credibility instruction for such a witness . . . ." Specifically, he argues that Shannon's testimony was unreliable because of "[t]he pressure of the prison environment" and "[t]he introduction of benefits in exchange for testimony . . . [which] has an undeniable corrupting influence on the criminal process by encouraging those with little to lose to fabricate damaging testimony in order to reap the government's reward of freedom."

Following the appellate guidance in *Diaz* and *Salmond*, we decline to extend the jailhouse informant exception to the facts of the present case.[12] In *Diaz* and *Salmond*, the courts explained that "when the jury [is] aware of the [nonjailhouse informant] witness' involvement in the criminal justice system and their expectations that they would receive consideration in exchange for their testimony, a general credibility instruction is sufficient." (Internal quotation marks omitted.) *State* v. *Salmond*, supra, 179 Conn. App. 630; see *State* v. *Diaz*, supra, 302 Conn. 103.

In the present case, the jury was repeatedly advised that Shannon was incarcerated at the Bridgeport Correctional Center at the time he initiated contact with the police and that, in consideration for his cooperation, he was released from jail without having to make a bond payment and later received a favorable sentence on his felony charge. Shannon testified at trial regarding his motive to talk to the police, as well as the benefits he received, on both direct examination and cross-examination. See footnote 9 of this opinion. Moreover, during closing arguments, defense counsel told the jury how Shannon's motivations and favorable treatment could be taken into consideration when determining his credibility.[13] Accordingly, we conclude that the jury was aware of Shannon's involvement in the criminal justice system and his expectation that he would receive consideration in exchange for talking to the police. Therefore, under *Diaz* and *Salmond*, a general credibility instruction is sufficient.[14]

The court, in its charge to the jury, gave a general

credibility instruction. In that instruction, the jury was told to consider "any interest, bias, prejudice or sympathy which a witness may apparently have for or against the state, or the accused or in the outcome of the trial." See *State* v. *Salmond*, supra, 179 Conn. App. 631. We therefore conclude that the court did not err in denying the defendant's request for a jailhouse informant instruction.

## II

The defendant additionally claims that the trial court erred with respect to its jury instruction on eyewitness identification. Specifically, the defendant argues that "[a] specific instruction on the dangers of eyewitness identification was required in this case . . . ." We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. In September, 2012, Teele was at work when the police approached her and asked her whether she would be willing to speak to them. Once Teele said that she was willing to talk, the police introduced the case to her using the defendant's nickname, "BJ." When Teele later met with the police and told them what she had witnessed on the night of June 21, 2010, the police presented her with a photographic array. From that photographic array, Teele identified the defendant as the individual that she saw shoot the victim.[15] When Shannon spoke to the police in February, 2013, he viewed a series of photographs and identified the defendant as the individual who confessed to the shooting and whom Shannon saw in the Greene Homes on the night of June 21, 2010.

Both Teele and Shannon knew the defendant prior to seeing him in the Greene Homes on June 21, 2010.[16] Teele had known the defendant for a "couple [of] months" and had seen him around the Greene Homes a "couple [of] times" per week during that time. Similarly, Shannon had known the defendant for "two [to] three months" and had seen him in the Greene Homes on "five [or] six different occasions." Accordingly, both Teele and Shannon had known the defendant before making their identifications in September, 2012, and February, 2013.

In the defendant's written request to charge, the defendant requested instructions regarding specific factors affecting the accuracy of eyewitness identifications. Specifically, the defendant requested that the court instruct the jury about the capacity and opportunity of a witness to observe the perpetrator, including the length of time available to the witness to make the observations, the distance between the witness and the perpetrator, the lighting conditions at the time of the offense, whether the witness had seen or known the person in the past, the history, if any, between them,

including any degree of animosity, and whether any-thing distracted the attention of the witness during the incident. The defendant also requested that the court instruct the jury to consider the length of time that elapsed between the occurrence of the crime and identi-fication of the defendant by the witness, and the sug-gestibility of the procedure used when the witness first viewed and identified the defendant.[17]

In its final charge to the jury, the court instructed: "In this case, the state has presented evidence that certain witnesses identified the defendant in connection with the crime charged. These included Angela Teele, who testified she saw the defendant shoot the decedent, and Larry Shannon, who testified he saw the defendant in close proximity to the shooting location shortly before he heard gunshots. . . .

"In arriving [at] a determination as [to] the matter of identification, you should consider all the facts and circumstances that existed at the time of the observa-tion of the perpetrator by each witness. In this regard, the reliability of each witness is of paramount impor-tance. Since identification testimony is an expression of belief or impression by the witness, its value depends upon the opportunity and ability of the witness to observe the perpetrator at the time of the event and to make an accurate identification later. It is for you to decide how much weight to place upon such testimony. In short, you must consider the totality of the circum-stances affecting any identification.

"Remember, the state has the burden to not only prove every element of the crime, but also the identity of the defendant as the perpetrator of the crime. You must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime or you must find the defendant not guilty. If you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty."

We turn to the legal principles that guide our review of the defendant's claim. "Our Supreme Court has held that identification instructions are not constitutionally required and [e]ven if [a] court's instructions were less informative on the risks of misidentification . . . the issue is at most one of instructional error rather than constitutional error. A new trial would only be war-ranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled. . . . The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law.

"We review nonconstitutional claims of instructional error under the following standard. While a request to charge that is relevant to the issues in a case and that

accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. A challenge to the validity of jury instructions presents a question of law over which this court has plenary review." (Citations omitted; internal quotation marks omitted.) *State* v. *Crosby*, 182 Conn. App. 373, 410–11, 190 A.3d 1, cert. denied, 330 Conn. 911, 193 A.3d 559 (2018). "Significantly, our Supreme Court in [*State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012)] emphasized that a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions on eyewitness testimony are warranted. . . . In reviewing the discretionary determinations of a trial court, every reasonable presumption should be given in favor of the correctness of the court's ruling." (Internal quotation marks omitted.) Id., 416.

Our Supreme Court has recognized that, "although there are exceptions, identification of a person who is well known to the eyewitness generally does not give rise to the same risk of misidentification as does the identification of a person who is not well known to the eyewitness." *State* v. *Guilbert*, supra, 306 Conn. 259–60. Moreover, our Supreme Court has acknowledged that reviewing courts in other jurisdictions "have found no impropriety in trial courts' failures to give specialized jury instructions on eyewitness identifications when a witness had previous contact with the defendant." See *State* v. *Williams*, 317 Conn. 691, 705 n.14, 119 A.3d 1194 (2015).

In the present case, both Teele and Shannon had known the defendant prior to seeing him on the night of June 21, 2010. Therefore, their identifications of the defendant did not give rise to the risk of misidentification[18] that the defendant's requested instructions were specifically designed to address.[19] By omitting the defendant's requested instructions, the trial court tailored the instructions to adapt to the issues of the case. See *State* v. *Crosby*, supra, 182 Conn. App. 411 ("as long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper" [internal quotation marks omitted]). Accordingly, we conclude that it is not reasonably probable that the jury was misled by the court's instructions.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The victim died from a gunshot wound to the head. Another bullet grazed

the victim's right forearm.

[2] Officer Vincze explained at trial that he was not surprised that "people just walked away from [him]" because "[i]t's a common thing in housing complexes."

[3] Marshal Robinson, a firearms expert, testified that the nine millimeter spent cartridge casing found at the scene could have been fired by at least fifty types of guns, including a nine millimeter Ruger handgun.

[4] The police first talked to Beau on July 5, 2010. Beau denied that he was with the defendant on that night and denied knowing the defendant. At trial, Beau acknowledged that he had met the defendant while they were in school together, but maintained that he was not with the defendant on the night of June 21, 2010.

[5] Detective Tenn's investigation was prolonged due to a lack of forthcoming witnesses willing to speak to the police about what they had seen. Teele explained that she did not talk to police until September, 2012, because "[she] was told if [she] said something that things was gonna happen," and that she feared for her safety. Similarly, Shannon explained that it was "not acceptable" to talk to police and that he feared retaliation.

[6] Although the shooting occurred at night, several witnesses, including Teele, described the lighting at the Greene Homes as "spotlight" or "stadium" lighting.

[7] Specifically, Teele stated that the defendant "walked up on Booman, Booman back was turned, and [the defendant] shot him."

[8] See footnote 2 of this opinion.

[9] The defendant also claims that, "whether or not it was error to fail to give a special credibility instruction, it was error for the court to fail to give the jurors guidance on assessing Shannon's credibility by telling them about the nine factors contained in [the] defendant's request to charge." See footnote 10 of this opinion. Because we conclude that the defendant was entitled only to a general credibility instruction under *State* v. *Diaz*, 302 Conn. 93, 25 A.3d 594 (2011), and *State* v. *Salmond*, 179 Conn. App. 605, 180 A.3d 979, cert. denied, 328 Conn. 936, 183 A.3d 1175 (2018), we reject the defendant's claim.

[10] In addition to Shannon's testimony during direct examination about the benefits he received in consideration for talking to the police, defense counsel cross-examined Shannon regarding his motive to talk to the police and testify at trial. On cross-examination, the following colloquy took place:

"[Defense counsel]: Jail is not a place that you like to be, right?

"[Shannon]: Yes.

"[Defense counsel]: And you wanted to get out of jail, right?

"[Shannon]: Yes.

"[Defense counsel]: Okay. And so it's at that point that you reached out to detectives and said that you have some information about this homicide that occurred on June 21, 2010, right?

"[Shannon]: Yes.

"[Defense counsel]: And you reached out to them because you were hoping that they could give you some favorable treatment on your jail situation or your criminal . . . charge, right?

"[Shannon]: Yes.

"[Defense counsel]: In fact, at the time you were . . . charged with a felony, right?

"[Shannon]: Yes.

\*\*\*

"[Defense counsel]: And shortly after that, you were released from jail without having to pay a bond, right?

"[Shannon]: Yes.

"[Defense counsel]: And a bond is money that you have to pay to get out of jail, if you're facing pending charges?

"[Shannon]: Yes.

"[Defense counsel]: You didn't have the money to . . . get out of jail, right?

"[Shannon]: No.

"[Defense counsel]: Okay. So you were hoping to trade the information that you have in order to . . . accomplish that, right?

"[Shannon]: Yes.

"[Defense counsel]: And, in fact, you were also looking for some favorable treatment on your case, right?

"[Shannon]: Yes."

[11] The defendant requested the following instruction: "A witness who testified in this case, Larry Shannon, was incarcerated and was awaiting

trial for some crimes other than the crime involved in this case at the time he first provided information to police. You should look with particular care at the testimony of the witness and scrutinize it very carefully before you accept it. You should consider the credibility of this witness in the light of any motive for testifying falsely and inculpating the accused.

"In considering the testimony of Larry Shannon, you may consider such things as: (1) [t]he extent to which his testimony is confirmed by other evidence; (2) [t]he specificity of the testimony; (3) [t]he extent to which the testimony contains details known only by the perpetrator; (4) [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; (5) [t]he informant's criminal record; (6) [a]ny benefits received in exchange for the testimony or providing information to the police or prosecutor; (7) [w]hether the witness expects to receive a benefit in exchange for the testimony or providing information to the police or prosecutor, regardless of whether such an agreement actually exists; (8) [w]hether the witness previously provided reliable or unreliable information; [and] (9) [t]he circumstances under which the witness initially provided the information to the police or the prosecutor, including whether the witness was responding to leading questions." The nine factors that the defendant cited were set forth in *State* v. *Arroyo*, 292 Conn. 558, 570, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010), a case involving jailhouse informants.

[12] The defendant attempts to distinguish the present case from *Diaz* by pointing out that the claims involving nonjailhouse informants in *Diaz* were not preserved and were therefore reviewed by the court under the plain error doctrine. We are not persuaded. In *Diaz*, our Supreme Court concluded that, in cases involving nonjailhouse informants, defendants are not entitled to a special credibility instruction. The court in *Diaz* concluded that "the trial court's failure to give a special credibility instruction concerning the testimony of [the nonjailhouse informants] pursuant to *Patterson* or *Arroyo* would not have been improper *even if the defendant had requested such an instruction*." (Emphasis added.) *State* v. *Diaz*, supra, 302 Conn. 104. Moreover, a preserved claim was subsequently considered and rejected by this court in *Salmond*.

The defendant also attempts to distinguish *Salmond* from the present case because *Salmond* involved a witness' testimony about events he had personally witnessed from his "front row seat." (Internal quotation marks omitted.) *State* v. *Salmond*, supra, 179 Conn. App. 630. The defendant argues that his case is different because, at his trial, Shannon testified about a confession in addition to events that he had personally witnessed. We are not persuaded. The defendant's confession to Shannon on June 22, 2010, like the events that Shannon had witnessed the night before, had taken place outside of the prison environment.

Simply put, there is no law to support the defendant's contention that he was entitled to a special credibility instruction under the circumstances of this case. Although the defendant cites to *State* v. *Arroyo*, supra, 292 Conn. 558, in support of his argument that this court should extend *Patterson*, his argument is misplaced. *Arroyo* involved jailhouse informants. Moreover, our Supreme Court, when it had the opportunity to do so, declined to extend *Arroyo* in *Diaz*. See *State* v. *Diaz*, supra, 302 Conn. 103–104.

[13] Defense counsel told the jury: "[T]his case . . . is a case that really comes down to the reliability and believability or the lack thereof of two witnesses; Angela Teele and Larry Shannon . . . . I think you have to consider Larry Shannon's motivations as well in this case. Larry Shannon's a multiple time convicted felon and you can take that into account in assessing his credibility. Like Angela Teele, he doesn't come forward in this case for more than two years. I think it's about two and a half years at the point when he comes forward and provides information to the police. He contacts police only when he has something to gain for himself. He's in jail, he doesn't like to be in jail, he told you that. He's already been arrested for a felony charge. He's already on probation for a felony charge. He talks to police and then all of a sudden he's let out of jail, gets a favorable disposition on his criminal cases, he never has to go back to jail. Things work out pretty well for Larry Shannon. And those are the sorts of things that you can consider when you're sizing up his credibility and his believability and whether he's really telling the truth or whether he's coming forward two and a half years later just to try and help himself out at that point. You also heard that currently he's on probation. He has a five year sentence suspended that's hanging over his head. It's up for you guys to consider whether that's motivating him in any way now."

[14] The defendant requests that we "reject [this court's] crimped approach [in *Salmond*]." It is this court's policy to decline to overrule a decision made by another panel of this court absent en banc consideration. *In re Zoey H.*, 183 Conn. App. 327, 340 n.5, 192 A.3d 522, cert. denied, 330 Conn. 906, 192 A.3d 425 (2018).

[15] On appeal, the defendant claims that this identification procedure was suggestive because the police had referred to "BJ" before conducting the photographic array. At trial, during the defendant's cross-examination of Detective Tenn, the following colloquy took place:

"[Defense counsel]: [O]ne of the things you're trained on is the proper way to conduct a witness identification procedure?

"[Detective Tenn]: Yes.

"[Defense counsel]: And one of the things that you're trained is that when you're conducting an interview with a potential witness, you never want to tell the witness the name of the . . . suspect, right?

"[Detective Tenn]: Right.

"[Defense counsel]: Cause . . . you don't want to tip your hand or do anything that might influence the witness to pick the suspect out as the perpetrator, right?

"[Detective Tenn]: Correct.

"[Defense counsel]: You want to make sure that if they pick somebody out of identify somebody, that you're not influencing them in any way and that it's actually coming from them, right?

"[Detective Tenn]: That's right.

"[Defense counsel]: Okay. Because otherwise, it could lead to a mistake and a false identification, right?

"[Detective Tenn]: Right."

During his closing argument, the defendant highlighted Detective Tenn's testimony and how it related to Teele's identification of the defendant: "[Y]ou heard from Detective Tenn that police are trained when they're interviewing a witness to a crime, that they're not to sort of tip their hand or tell the witness who it is they believe the perpetrator of the crime is, because that could lead to a mistaken identification. It could lead to . . . the witness identifying the person that the witness believes the police want the witness to identify, and that's what happened here. I mean, they said to her, we want to talk to you about the BJ case. Maybe they meant to say, Booman. But the bottom line is, they . . . provided the name to her. So I think you have to ask yourself did that suggest to her in any way who or what they . . . wanted her to say or identify in the case. Detective Tenn told you that that's where a procedure is completely improper."

[16] The defendant suggests that the witnesses did not know the defendant, and merely "knew of" him through other people. This assertion is not supported by the record. Both Teele and Shannon testified that they personally had seen the defendant on multiple occasions. Although Teele did, at one point, say that she "knew of" the defendant, she shortly thereafter stated that she had "seen him around in [the Greene Homes]."

[17] In his written request to charge, the defendant also requested an instruction that the jury may "take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness." On appeal, the defendant claims that "[w]hen Shannon spoke with police in jail, they showed him a single photograph of the defendant rather than an array." The defendant, however, mischaracterizes the identification procedure. Shannon was not shown just a single photograph of the defendant. Rather, the police showed Shannon a *series* of photographs. This identification procedure is known as a sequential photographic array. See *State* v. *Williams*, 146 Conn. App. 114, 129 n.16, 75 A.3d 668 (2013) ("In a simultaneous array, all of the photographs are shown to the witness at one time. In a sequential array, the photographs are shown to the witness one at a time."), aff'd, 317 Conn. 691, 119 A.3d 1194 (2015). Thus, the identification procedure did not involve "the presentation of the defendant alone" as his requested jury charge suggested. Accordingly, by omitting the defendant's requested instruction, the trial court merely tailored the instruction to adapt to the evidence of the case.

[18] Rather, as the state emphasizes in its appellate brief, the issue would have been one of *false* identification, not *mis*identification. As defense counsel argued in his closing argument, "the case entirely hinges, in our view, on the credibility or lack thereof of Angela Teele and Larry Shannon." We note that the court sufficiently addressed witness credibility in its instruction to the jury. See part I of this opinion.

[19] The defendant argues that his "request to charge substantially tracked the language of the model [charge in *United States* v. *Telfaire*, 469 F.2d 552 (D.C. Cir. 1972)], which our state's judges have incorporated into the Judicial Branch's criminal charge on identification . . . to warn juries about the dangers inherent in eyewitness identification." He concedes that our Supreme Court "has never required that a *Telfaire* instruction must be given verbatim in order to ensure that the jury is properly guided . . . ." Nonetheless, the defendant argues that "the main principles of the court's charge must adequately cover the dangers of *mis*identification." (Emphasis added.)